[Civ. No. 38076. First Dist., Div. Four. Jan. 30, 1976.]

META KATZOFF et al., Petitioners, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY
OF SAN FRANCISCO, Respondent;
DEPARTMENT OF PUBLIC SOCIAL SERVICES
OF SAN FRANCISCO et al., Real Parties in Interest.

1080

COUNSEL

Robert L. Walker, Susanne Martinez, Ross, Hacket & Segall and John G. Segall for Petitioners.

Thomas M. O'Connor, City Attorney, and Marie Burke Lia, Deputy City Attorney, Robert Nicco, Public Defender, and Walter D. Herrick, Deputy Public Defender, for Respondent and for Real Parties in Interest.

OPINION

CALDECOTT, P. J.—Petitioners Meta and Richard Katzoff seek review of an order of the San Francisco Superior Court allowing the Department of Public Social Services of the City and County of San Francisco to remove two-year-old Dimitri Wallace from their home, where they have been caring for him as a foster child.

Dimitri was born to Diane and Howard Wallace on December 26, 1973. Shortly after his birth, he exhibited symptoms of withdrawal from neonatal drug dependence. On January 16, 1974, he was admitted to a San Francisco hospital with a fracture of the left humerus, "analogous to the battered child syndrome." Dimitri was placed in the Katzoff home in San Rafael in February 1974. He has remained with the Katzoffs, who recently moved to Petaluma, until the present time.

On March 15, 1974, Dimitri was declared a dependent child of the superior court (Welf. & Inst. Code, § 600 et seq.) on the ground that his home was "unfit for him by reason of the neglect and physical abuse of his parents." (See Welf. & Inst. Code, § 600, subd. (d).)[1] The Wallaces then moved to Marin County, and the dependency petition was thereafter transferred to the Marin County Superior Court. On May 30, 1974, after Mrs. Wallace moved back to San Francisco, the case was returned to the San Francisco Juvenile Court which committed Dimitri "to the care and custody of the Department of Social Services for placement, supervision, and planning."

---

[1] "§ 600. Any person under the age of 18 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge such

Pursuant to Welfare and Institutions Code section 729, an annual review hearing of Dimitri's dependency status was held on November 13, 1975. A report by the child welfare worker was prepared and submitted to the court before the hearing.

At the hearing, the deputy city attorney, representing the San Francisco Department of Social Services (DSS), requested that Dimitri's dependency status be reviewed, and that Mrs. Wallace (who was present and represented by counsel) be advised that an abandonment proceeding (Civ. Code, § 232) might be commenced against her if she does not establish and maintain a relationship with her son. The city attorney also requested that Dimitri be removed from the petitioners' home and placed in another foster home in San Francisco, stating: "The Foster parents have done an excellent job in providing care. But the Foster parents have had some difficulties with consenting with the re-unification of the mother and child and some difficulties of visitation between the mother and child. And they have had objections to our working—the Department of Social Services—working in the past on the case to the extent we have been contacted by the authorities in Marin County, the State of California, and now Solano County, indicating an interest to use the other jurisdictions."

The city attorney also referred to the fact that since Dimitri is black, and the Katzoffs are white, their home is not an adoptive possibility and that the department was prepared to place Dimitri in a black foster home in San Francisco "which understand the relationship with the natural parents and their obligations."

Attorney for petitioners denied that the Katzoffs had failed to cooperate with the DSS in allowing the natural mother to visit with Dimitri; he asserted that the Katzoffs' primary interest was to have Dimitri placed in a suitable adoptive home, and that to place him in a new foster home pending further action by the DSS would not be in the child's best interests. Petitioners' attorney submitted six letters from physicians, psychiatrists, and friends which support the Katzoffs' contention that Dimitri should not be placed in a new foster home. Petitioners' attorney then offered the testimony of Mrs. Katzoff to the effect that she

---

person to be a dependent child of the court.

"(d) Whose home is an unfit place for him by reason of neglect, cruelty, depravity, or physical abuse of either of his parents, or his guardian or other person in whose custody or care he is."

and her husband had fully cooperated with the DSS in allowing Dimitri's natural parents to visit him. The trial court refused to allow this or any other testimony. The court ordered that dependency status be continued and that "the Social Worker [is] authorized to remove [the] child from [the] present foster home." Dimitri was removed from the custody of the Katzoffs and placed in a San Francisco foster home that afternoon.

On November 20, 1975, petitioners again appeared before the court with the request to reconsider the order. After hearing argument by counsel, the motion was denied.

On December 1, 1975, the Katzoffs filed a petition for writ of mandate with this court. We issued an alternative writ and stayed the trial court's order of November 13, 1975, pending our decision on the petition. We specifically ordered that "during the pendency of these proceedings that the minor, Dimitri Wallace, be returned to the foster home of petitioners Meta Katzoff and Richard Katzoff."

I

Petitioners assert that under the recent Supreme Court case of *In re B. G.,* 11 Cal.3d 679 [114 Cal.Rptr. 444, 523 P.2d 244], they have standing as Dimitri's "de facto parents" to contest the removal of Dimitri from their home.

The children in *In re B. G.* were born in Czechoslovakia of Czechoslovakian parents. In 1968, the father and the two children came to the United States; the mother refused to join them. One year later the father died and the children were placed with foster parents. The mother, while in Czechoslovakia, made arrangements through the embassy to have the children returned to her. On the day of the flight, the foster parents and the children went into hiding.

In response to a petition of the foster parents' attorney, the Court of Appeal ordered the court to hold a "dispositional hearing." The trial court's decision denying the mother custody of the children was the subject of the appeal. The court's conclusion that a parent may be denied custody only if the trial court first determines that parental custody would be harmful to the child is not directly in point here. However, the following holding on the legal status of the foster parents is the basis of petitioners' claim: "The status of the de facto parent received statutory

sanction with enactment of the Family Law Act in 1969. Previously Civil Code section 138 distinguished only between awards of custody to parents and to nonparents; the Family Law Act, in Civil Code section 4600, added the stipulation that when an award of custody to the parent would be detrimental next in order of preference stands 'the person or persons in whose home the child has been living in a wholesome and stable environment.'

"The juvenile court in a dispositional hearing must undertake 'a judicious appraisal of all available evidence bearing on the child's best interests' including an evaluation of the relative merits of alternative custody awards. (*In re A. J.* (1969) 274 Cal.App.2d 199, 202 [78 Cal.Rptr. 880].) The presence of de facto parents will aid the court in that endeavor; the views of such persons who have experienced close day-to-day contact with the child deserve consideration; moreover, an award of custody to such de facto parents is often among the alternate dispositions which the court must evaluate.

"We conclude that de facto parents, such as the foster parents in this case, should be permitted to appear as parties in juvenile court proceedings. Their standing should not depend upon the filing of a petition for guardianship, although the filing of such petition may aid in attesting to their interest in the custody of the child; nor should their participation be restricted to the limited role of an amicus curiae; they should be permitted to appear as parties to assert and protect their own interest in the companionship, care, custody and management of the child.[21]"[2] (11 Cal.3d at p. 693.)

■ It appears that petitioners have been denied the very right reserved to them by *B. G.*: "to appear as parties to assert and protect their own interest in the companionship, care, custody, and management of the child." If the participation of the foster parents, either through their testimony or by their presentation of other evidence, would have provided the court with relevant information as to Dimitri's best interests, the court should have permitted their participation and considered the evidence presented. (See *In re A. J.*, 274 Cal.App.2d at p. 202.)

[2]Footnote 21 reads: "We do not hold that a de facto parent is a 'parent' or 'guardian' as those terms are used in the Juvenile Court Law, nor do we express a position whether constitutional principles of due process or equal protection may require that a de facto parent, in some instances, receive rights of notice, hearing, or counsel afforded natural parents or guardians under that law."

The record before us provides an excellent example of the desirability of such a rule. No one disputes the fact that Dimitri has been cared for by the Katzoffs from the age of three months to the present time, and that the amount and quality of the care he has received is excellent. This fact is virtually the only point argued by the parties which is not disputed.

It is clear that there are several areas of factual disputes upon which the court could have received evidence. The court merely heard the arguments of counsel, laden with factual assertions of a testimonial nature, and proceeded to rule in favor of the department.

The paramount concern of this court, and of all the parties to the action should be the best interests of Dimitri, and to try to "maximize a child's opportunity to develop into a stable, well-adjusted adult." (*Adoption of Michelle T.*, 44 Cal.App.3d 699, 704 [117 Cal.Rptr. 856].) As noted above, the fact of Dimitri's well-being in the Katzoff home is not disputed. We must also recognize that the removal of a two-year-old from a home where he has been cared for since the age of three months will be extremely difficult. Conspicuously absent from the arguments during the two hearings is any expression of concern about the mental or emotional security, stability, or well-being of the child, or the strain which the change in foster homes will place on him. With the record before us, it is impossible to determine whether or not this move is actually necessary; the language in *B. G.* and the concern for the child's welfare require that the court at least allow the foster parents to present their side of the case, and that the court rely on competent evidence presented to it, not merely on the allegations of counsel, before ruling on the case.

## II

The initial dependency petition and declaration were made under Welfare and Institutions Code section 600, subdivision (d). Petitioners contend that it was error for the court to refuse to appoint as counsel for the child an attorney who had volunteered his services at no cost to the City and County of San Francisco. Petitioners filed a petition for appointment of said attorney on November 17, 1975, and this was denied by the court in chambers that same day.

Respondent does not deny that appointment of counsel for the juvenile is mandatory under the provisions of Welfare and Institutions Code section 634.5. That section provides: "Notwithstanding the provisions of Section 634, when a minor who is alleged to be a person

described in subdivision (d) of Section 600 appears before the juvenile court at a detention hearing, the court shall appoint counsel. The court may appoint the district attorney to represent the minor pursuant to Section 681.

"The counsel appointed by the court shall represent the minor at the detention hearing and at all subsequent proceedings before the juvenile court."

Respondent asserts that a district attorney represented the minor at the initial dependency proceedings. ■ However, there is no indication in the record that the minor was represented by counsel at the review hearing, nor does respondent so argue. Indeed, the only reference to such representation is a statement by the court to petitioner's attorney, who initially stated that he represented the minor, that: "I never appointed you to represent the child. No lawyer is going to represent the child without a court appointment." Neither in the juvenile court nor on appeal does the city attorney contend that she represented the minor. The provision in the code permitting the court to appoint the district attorney does not prove that it has done so.

This lack of representation by counsel is plainly in violation of the statutory mandate. ■ However, the right to counsel, either constitutional or statutory, does not require the court to appoint a particular attorney requested even by the party (let alone third persons, as here) even if such counsel has indicated his willingness and availability to act. (*Drumgo* v. *Superior Court,* 8 Cal.3d 930, 934 [106 Cal.Rptr. 631, 506 P.2d 1007, 66 A.L.R.3d 984], cert. den., 414 U.S. 979 [38 L.Ed.2d 223, 94 S.Ct. 272].) Thus, although the court must appoint counsel for the minor at the hearing ordered herein, the particular appointment rests within the sound discretion of the trial judge, which cannot be disturbed unless abused.

The alternative writ is discharged. Let a writ of mandate issue commanding the respondent court to conduct review proceedings in which petitioners shall be permitted to appear as parties, and to appoint counsel to represent the minor child.

Christian, J., and Emerson, J.,* concurred.

The petition of the respondent and the real party in interest Department of Public Social Services for a hearing by the Supreme Court was denied March 24, 1976.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.